Elias (Louis) Saka a/k/a Ralph Costa v. Commissioner.
Saka v. Commissioner
Docket No. 340-63.
United States Tax Court
T.C. Memo 1966-25; 1966 Tax Ct. Memo LEXIS 256; 25 T.C.M. (CCH) 123; T.C.M. (RIA) 66025; January 28, 1966
*256 1. Held, that petitioner did not realize any taxable income from certain transactions with two North African firms named Mondial Investment Corporation and Victor Trading Company, that were, in form, export sales of merchandise. The proceeds realized by petitioner were in fact his own funds; and the transactions were nothing more than devices to enable petitioner to transfer wealth which he had accumulated while working and living in Morocco for 6 1/2 years, in circumvention of the foreign exchange restrictions of the Moroccan government. Held, further, that petitioner did realize taxable income for the year involved from two other transactions with a third North African firm known as SAMA, whereby said firm was defrauded. Amount of such income determined. 2. Held, petitioner is liable for self-employment tax for 1955. 3. Held, there is an underpayment in petitioner's income tax for 1955; and such underpayment is due to fraud within the meaning of section 6653(b) of the 1954 Code; and therefore petitioner is liable for an addition to tax for fraud with respect to such underpayment. 4. Held, petitioner is liable for an addition to tax for the year 1955, under section 6654(a), for *257 failure to pay estimated tax. 5. Held, the return filed by petitioner for the period July 20 to December 31, 1955 - assuming such return to be a valid return - is false or fraudulent with intent to evade tax within the meaning of section 6501(c)(1). Accordingly, assessment and collection of the deficiency and additions to tax for 1955 are not barred by the statute of limitations. David F. Price, for the petitioner. Robert A. Trevisani and Kennard I. Mandell, for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined a deficiency in the income taxes (included in which was a deficiency in self-employment tax) of the petitioner for the calendar year 1955 in the amount of $97,437.75; and he also determined the following additions to tax: (1) For fraud, under section 6653(b) of the 1954 Code, in the amount of $48,718.88 * ; and (2) for failure to pay estimated tax, under section 6654(a), in the amount of $2,718.18. The issues for decision are: (1) What, if any, profit was realized by the petitioner in 1955 *258 upon certain transactions that were, in form at least, export sales of electrical equipment to firms in North Africa? (2) Is the petitioner liable for the payment of self-employment tax for the year 1955, under section 1401 of the 1954 Code? (3) Was any part of any deficiency for the year 1955 which this Court may hold to be owing by petitioner, due to fraud within the meaning of section 6653(b)? (4) Is the petitioner liable for an addition to tax under section 6654(a) for failure to pay estimated tax? (5) Are assessment and collection of any deficiency and additions to tax for the year 1955, barred by the statute of limitations? This issue raises the questions whether petitioner was obliged to file a return for the full calendar year 1955, or for only part of said year (July 20-December 31); whether a Form 1040 return filed by the petitioner for the period July 20-December 31, 1955, is to be treated as a valid income tax return; and if it is to be so treated, whether said return is false or fraudulent with intent to evade tax within the meaning of section 6501(c)(1). Respondent has conceded that two of the adjustments in his statutory notice of deficiency as to which error was assigned *259 in the petition (dealing with alleged unreported interest income and alleged capital gain on the sale of a residence) are improper. Findings of Fact Some of the facts were stipulated. The stipulation of facts, together with all exhibits identified therein, are incorporated herein by reference. Petitioner, Elias Saka, presently resides in Deal, New Jersey. He filed an individual Federal income tax return for the period July 20-December 31, 1955, with the district director of internal revenue at Brooklyn, New York. He is, and has always been, a citizen of the United States. Petitioner was born in Brooklyn in 1924. Although his correct first name is Elias, his parents and many of his business acquaintances have called him "Louis" or "Lou." For a time in 1955, in circumstances presently to be described, petitioner used the assumed name "Ralph Costa." He did not complete high school; but he was admitted to Cooper Union College on the basis of college entrance examinations which were in lieu of a high school diploma. After attending Cooper Union in 1941 and 1942, he entered the United States Army Air Corps in December of the latter year, where he served as a navigator until late 1945 when *260 he was honorably discharged. Upon return to civilian life, petitioner attended the New School of Social Research in New York City. In or about October 1948, petitioner went to Casablanca, French Morocco, where he lived for approximately the next 6 1/2 years. Petitioner's business while living in Morocco was that of an "indent agent." As an indent agent, petitioner's function was to represent businesses in Casablanca which desired to import merchandise from various prominent firms in the United States with which he had work arrangements. Petitioner would place orders for his Moroccan customers with the United States firms and take care of the details prerequisite to import - such as arranging for foreign exchange, shipping, bringing the merchandise through Moroccan customs and seeing to its delivery to petitioner's customers. Petitioner derived two types of income from his business as an indent agent. One was commissions from his customers based upon the amount of their purchases. The other was profit on the conversion of his customers' Moroccan francs into dollars, that arose in the following manner: It was necessary for petitioner to purchase United States dollars in order to pay *261 the American firms for the merchandise; and in acquiring these dollars on the so-called "black market," petitioner was able to obtain them at a slightly less number of francs per dollar than his customers had given him for the purpose. For example, if 450 francs were required to purchase each U.S. dollar on the black market, petitioner was able to obtain dollars for 440 francs per dollar; and he kept the 10 franc-per-dollar differential for himself. Petitioner considered himself a bona fide resident of a foreign country during the years 1949 through 1954 while he was living in French Morocco; and he did not file any Federal income tax returns or pay any Federal income taxes for those years. By late 1954 petitioner had accumulated personally, Moroccan francs which at the then prevailing black market rate were worth several thousands of dollars in United States money. The worsening political situation in the French territories in North Africa in the years 1952-1954 (both the native uprisings against the French, and the counter-revolutionary activities of the French residents) impelled petitioner to conclude in the fall of 1954 that, in the interest of his physical safety, he probably *262 would have to return to the United States sometime in the not too distant future. In late 1954, he began seeking means whereby he could convert his monetary assets from Moroccan francs into United States dollars. Petitioner believed that if he were required to leave Morocco suddenly, he would find it impossible to get his accumulated funds out of that country on short notice, without taking a heavy loss. Moroccan foreign exchange restrictions forbade him taking his Moroccan francs out of the country in straightforward legitimate transactions handled through Moroccan banks. A quick way to attain his objective would be to go into the black market and purchase dollars payable to himself in the United States; but this method would entail petitioner's losing between 30 and 40 percent of his Moroccan francs. Petitioner thereupon decided that the most feasible way to transfer his money out of Morocco and into the United States would be to go through what appeared to be a series of transactions whereby he would ostensibly import merchandise into Morocco. Basically petitioner's plan involved, first locating Moroccan firms who had licenses to import electrical equipment from the United States *263 into Morocco; having these Moroccan firms place orders for electrical equipment; having the firms arrange through their Moroccan banks for opening letters of credit with New York banks, whereunder an American export representative would be able to collect United States dollars upon presenting to the American banks evidence of shipment of electrical equipment; and having petitioner furnish to the Moroccan firms a sufficient amount of his accumulated Moroccan francs to enable the Moroccan firms to cover the letters of credit that they had caused to be opened. The Moroccan firms, having licenses to import, would thus be able to purchase dollars at the official rate of exchange; and the petitioner would actually pay these Moroccan firms a greater amount of francs per dollar, thereby permitting these firms to make a profit from use of their licenses. The key element in petitioner's plan was that the electrical equipment which would actually be purchased in the United States and shipped to Morocco would be worth only a small fraction of the amount that would be paid therefor. When this overvalued merchandise arrived in Morocco, it would be abandoned in the Moroccan customs. In implementation *264 of his plan, petitioner, in late November or early December 1954, approached a retired French army colonel, Andre Noirot, who operated as a money broker in Casablanca and who knew the identity of firms and individuals who had licenses to import merchandise but who did not plan to use the licenses and who were willing, for a price, to let someone else use said licenses. At the first meeting between petitioner and Noirot, petitioner told Noirot that he wanted to transfer several million francs out of Morocco. Noirot requested a few days to locate firms with import licenses. Five or six days later, petitioner returned to Noirot's office upon being advised by Noirot that matters had been arranged; and at that time Noirot introduced petitioner to a man named Ralph Costa who had been living in New York. It was agreed that Costa was to return to New York, rent office space, arrange for telephone service, and have forms and stationery printed for a purported business of an export representative. The Moroccan firms were to request, through their North African banking houses, that letters of credit be opened by their correspondent banks in New York in favor of Costa. Costa was to purchase electrical *265 equipment in the United States for shipment to Morocco, which would be billed to the Moroccan firms at a price greatly in excess of cost. Costa was thereafter to receive payment pursuant to the letters of credit, upon his presentation to the New York banks of the requisite evidence of shipment; and after deducting the relatively insignificant cost of the equipment shipped, the inland and ocean freight, the costs of the New York office space and the related expenses, and a fee for his services in the scheme - Costa was to turn over to petitioner the remainder of the dollar proceeds of the letters of credit. Petitioner, for his part, was to turn over the necessary quantity of Moroccan francs to Noirot to take care of a fee for Noirot and for payment to the Moroccan firms of sufficient francs to cover the cost of the dollars made available by them through their letters of credit plus extra francs to said firms for making their import licenses available for use in the scheme. Noirot proceeded to carry out the plan which he and petitioner had formulated. In the first transactions which we shall here consider, there were two Casablanca concerns involved: Mondial Investment Corporation and *266 Victor Trading Company. Mondial had its North African banking house open two irrevocable letters of credit in favor of Ralph Costa with a New York bank, French American Banking Corporation - one on February 7, 1955, in the amount of "about $25,000" and the other on February 14, 1955, in the amount of "about $12,000." Victor had its North African bank open an irrevocable letter of credit at the same French American bank in favor of Ralph Costa on March 2, 1955, in the amount of "about $38,000." In each of these situations, the Moroccan firms received from petitioner, through Noirot, sufficient francs to cover the amounts of these letters of credit. Meanwhile, Ralph Costa had left Casablanca in the latter part of December 1954 and had come to New York, Costa, acting as agent for the petitioner, rented office space in a building at 366 Broadway in New York City, under a lease covering the period January 15 to February 28, 1955. Petitioner, in late January 1955, received word in Casablanca from his father in Brooklyn that petitioner's mother was critically ill and not expected to live very long. Petitioner decided to come to the United States. He left Casablanca on February 8 and arrived *267 in New York on February 9 - too late to visit with his mother who had passed away on or about February 2. Petitioner called on Costa in the office at 366 Broadway; and in the course of a conversation between the two men, petitioner came to the conclusion that he could not trust Costa; and that if Costa received money under the letters of credit while petitioner was in North Africa, petitioner might never get the money. Petitioner then decided to take over from Costa and to handle himself those phases of the transactions that would be performed in the United States. As a consequence, petitioner offered Costa $5,000 to step aside; Costa accepted the offer; and Costa then gave petitioner permission to use his (Costa's) name. Petitioner, operating from the office which Costa had leased, thereupon and thereafter proceeded to purchase merchandise, in the name of Ralph Costa, which he caused to be shipped to Mondial and Victor in Casablanca. The cost of the merchandise so purchased and shipped was insignificant, in comparison with the amounts which petitioner received therefor under the letters of credit, through use of overbilled invoices. Petitioner, posing and holding himself out as Ralph *268 Costa, tendered sight drafts together with the necessary bills of lading, packing lists, and commercial invoices to the French American Bank; and this bank, upon receipt of these papers, honored petitioner's drafts and issued checks to him, payable to the order of "Ralph Costa," in the amounts called for in the invoices. The following schedule shows the amounts so paid over by the French American Bank to petitioner, the merchandise shipped, the cost thereof, and the shipping costs: Amount
received by
Shipping
Date (1955)
petitioner
Merchandise
Cost
cost
February 17
$26,116
4 heaters and 20 timers
$440.50
$ 56.80
February 25
12,800
100 electrical P.B. units
349.00
31.60
March 24
41,796
12 generators
934.32
436.43
The Court finds as ultimate facts that the amounts received by petitioner in the foregoing transactions involving Mondial Investment Corporation and Victor Trading Company, which had the appearance of being proceeds from export sales of merchandise to said firms by petitioner (using the name of Ralph Costa), actually represented transfers of petitioner's own funds to himself, by means of the above-described scheme to circumvent Moroccan foreign exchange restrictions; and that no portion of said *269 amounts represents taxable income to the petitioner. In addition to the above-described transactions (involving Mondial and Victor Trading), petitioner, Noirot, Costa and two individuals named Isaac Cohen and Salvatore Lo Pinto participated in two other transactions, unrelated to the previously described transactions, which are presently to be described. These two other transactions involved a Moroccan firm named Societe Anonyme Nouvelle d'Approviseionement (which was known as and is hereinafter called "SAMA"). In early February 1955, Isaac Cohen had a conference in Morocco with an individual named Kis who was head of the financial and accounting departments of SAMA. Cohen stated to Kis that he represented a company known as Groupement Electro Morocain (hereinafter called"GEM"). Cohen inquired of Kis whether SAMA, which was at that time principally an importer of foodstuffs and other merchandise into Morocco, would import certain electrical equipment with respect to which GEM had entered into contracts to sell to public utilities in Morocco. According to Cohen's proposal, GEM was to buy the equipment that SAMA would import; and then GEM was to sell the same to the public utilities. *270 Several days later a second conference was held, and at this conference Noirot was present also. About 10 days to 2 weeks thereafter, Noirot returned alone for a third meeting with Kis and the deal was agreed upon. Noirot tendered to Kis an instrument, known as a pro forma [1] *271 invoice, from Costa in New York City to SAMA, showing a sale of $22,323.72 worth of electrical equipment. Together with estimated packing and shipping charges, the total amount of this pro forma invoice was $24,458.72. SAMA agreed to import this equipment for GEM; and SAMA sought and received a downpayment of approximately 15 percent of the total price. Said down payment was made by Noirot to SAMA in 1,510,000 francs. SAMA (acting through a subsidiary or related company known as Transatlantique Financiere), then caused a bank in Tangiers to open with its correspondent bank in New York (then known as the Bank of the Manhattan Company, which is now known as and is hereafter called, the Chase Manhattan Bank) an irrevocable letter of credit in favor of "Ralph Costa" in the amount of "approximately"$25,000, United States currency. The Chase Manhattan Bank, on February 24, 1955, notified petitioner (who, as we have hereinabove found, had by that time replaced Costa, taken over his office, and assumed for himself the name Ralph Costa) that said credit had been opened in his favor. The above-mentioned pro forma invoice tendered by Noirot to SAMA *272 called for electrical controls, relays and transistors to be shipped by Costa. The merchandise actually purchased and shipped to SAMA by petitioner, consisted of 16 small electric room heaters costing $281, on which the shipping costs were $60.47. Petitioner presented to the Chase Manhattan Bank on March 9, 1955, his sight draft for $27,174.88, which was accompanied by the required documents, including bills of lading, packing list, and an invoice to SAMA for the above-mentioned amount. On the next day, March 10, the Chase Manhattan Bank issued to petitioner (in the name of Ralph Costa) its check for $27,174.88, honoring petitioner's draft. Petitioner deposited this check in a personal checking account which he had opened at the Chase Manhattan Bank in the name of Ralph Costa. On the 17th of March, 1955, an insurance firm in Casablanca issued to SAMA a policy of insurance in the amount of 14,000,000 francs - an amount which(in terms of dollars) was equal to or greater than the full invoice price of $27,174.88 of the electrical equipment shipped by petitioner. When the 16 heaters arrived in Casablanca, SAMA was unable to locate Noirot or Cohen, or any such business organization known *273 as Groupement Electro Morocain. An agent or employee of SAMA inspected the equipment; and when he discovered that what had actually been shipped was of relatively insignificant value, SAMA's officials simply abandoned said equipment in customs. SAMA was thereupon compelled to furnish to the Tangiers bank sufficient francs to cover the dollars that had been made available by it under the letter of credit. Meanwhile, in late February 1955, before the just-mentioned shipment arrived in Casablanca, Noirot and Isaac Cohen approached SAMA's man, Kis, for the purpose of having SAMA import additional electrical equipment under an arrangement similar to that involved in the first SAMA transaction. This second deal was ultimately concluded on March 4, when Noirot tendered to SAMA another pro forma invoice from Costa, this one calling for the shipment of certain other electrical equipment. The aggregate purchase price on this pro forma invoice (including estimated packing and shipping charges $800of) was $28,546.80. Noirot made another 15 percent downpayment with respect to this second SAMA transaction of 1,720,000 francs. SAMA, acting again through Transatlantique Financiere, caused the same *274 Tangiers bank to open another irrevocable letter of credit in favor of Costa, in the amount of "approximately" $28,500, at the Chase Manhattan Bank. The bank duly notified petitioner (who was still using the name of Ralph Costa) of the opening of this second letter of credit. Petitioner, following this, acquired 12 heaters and 140 relays, at an aggregate cost of only $1,498.80 which he shipped to SAMA in two shipments - the heaters on March 28 and the relays on April 7. Petitioner paid a total of $84.81 in shipping costs. Petitioner presented or caused to be presented two sight drafts to the Chase Manhattan Bank to cover the purported cost of the goods so purchased - one on March 28 for $22,440; and one on April 7 in the amount of $8,820 - together with the required shipping documents, including invoices to SAMA in the just-mentioned amounts; and the bank issued its checks to petitioner drawn to the order of Ralph Costa in these amounts. Petitioner likewise deposited these checks in his personal checking account (which was in the name of Ralph Costa) at the Chase Manhattan Bank. SAMA likewise insured this shipment in an amount equal to or greater than the amount called for in the second *275 pro forma invoice which Noirot had tendered. When these shipments in the second SAMA transaction arrived in Casablanca, SAMA (upon again discovering the relatively insignificant value of the equipment) abandoned such equipment in customs. SAMA, then as before, was compelled to make the Tangiers bank whole for the dollars represented by the letter of credit in this second SAMA transaction. Neither petitioner nor Noirot nor anyone else ever paid to SAMA any francs in addition to the above-mentioned 15 percent downpayments, on these first and second transactions, with the result that SAMA sustained a substantial loss in respect of each of these transactions. * * *
By April 13, 1955, the above-mentioned Chase Manhattan Bank account which petitioner had opened and maintained in the name of Ralph Costa, had largely been depleted. The balance on deposit in said account on that date was only $15.82. A portion of the funds ($4,912.64) which petitioner withdrew from said account was utilized to pay part of the purchase price of certain municipal bonds which he purchased for his own personal use, from a New York brokerage house where he had opened an account in the name of Ralph Costa. Another *276 substantial portion of said funds on deposit in the Chase Manhattan Bank was transferred to a checking account in petitioner's own true name(Elias Saka) in the Manhattan Trust Company, which he had maintained since 1949. And the balance of said funds was transferred to two other bank accounts which petitioner opened in Costa's name in the National City Bank and the Empire Trust Company. These latter two accounts were apparently utilized by petitioner to defray the expenses incurred by him in the United States in carrying out the exporting of the electrical equipment to Morocco in the Mondial, Victor Trading, and SAMA transactions hereinabove described. In addition to the costs of electrical equipment and the attendant freight costs for shipping the same to Morocco, petitioner incurred and paid the following expenses in carrying out the several transactions above mentioned: Rent on the office at 366 Broad-
way, New York
$130.00
Telephone for said office
162.53
Telephone Answering Service
70.90
$363.43 Petitioner also had paid to Ralph Costa, as hereinbefore found, $5,000 as the price for Costa removing himself as a participant in carrying out the transactions. Petitioner left the United States *277 for return to Casablanca in late March or early April 1955, after being in the United States since early February of that year. He reentered Casablanca on April 9. Thereafter, on or about April 18, petitioner and his wife left Casablanca; their plane landed at New York on April 19; and, after a lay-over of 2 or 3 hours, he and his wife took a plane to Canada. They returned to New York on or about July 20, 1955; and have lived in the New York-New Jersey area ever since. In late December 1955, SAMA assigned to a New York corporation named American and African Trading Corporation, its claim against petitioner and his several associates for the losses which it had sustained in the two above-described transactions. Thereafter in January 1956, this New York corporate assignee instituted a civil action for fraud in the Supreme Court of the State of New York for the County of New York (a trial court) against petitioner, Ralph Costa, and Salvatore Lo Pinto. In May 1964 said corporate assignee entered into a settlement with petitioner and Lo Pinto (but not with Costa, who had never been served). Under the terms of this settlement, petitioner agreed to pay said assignee $1,500; and the assignee *278 agreed, in consideration therefor, to dismiss with prejudice, its claim against petitioner and Lo Pinto. Petitioner, as part of the settlement agreed to testify for said assignee in another suit which the latter had instituted against the Chase Manhattan Bank, based upon the bank's having made the payments on the above-mentioned letters of credit to petitioner (instead of to the real Ralph Costa). Over a period from May to November 1964, petitioner paid the agreed $1,500 to said assignee; and on November 4, 1964, the assignee dismissed its said action against petitioner and Lo Pinto. Neither Mondial nor Victor Trading, unlike SAMA, ever instituted any action or made any claim against petitioner for reimbursement of any losses to them in respect of the above-described transactions in which these two companies were involved. Respondent's agents interviewed petitioner several times during the period between December 5, 1956, and March 3, 1959, with respect to his income tax liabilities for the year 1955. In these interviews, petitioner made numerous untrue statements to respondent's representatives. At an interview on December 5, 1956, petitioner stated to said representatives under oath, *279 that he did not earn any income during the year 1955, except the interest income on savings deposits which he had reported on his short-period return; whereas in fact, petitioner did realize additional unreported income from the two SAMA transactions described above. At this same interview, petitioner stated that he had not purchased the above-mentioned municipal bonds from the New York brokerage house, but rather that someone else had purchased them; while in point of fact, petitioner had purchased said bonds. Also at an interview with respondent's representatives on January 21, 1957, petitioner stated that he had never held himself out by any name other than Louis or Elias Saka; while in point of fact he had used the assumed name of Ralph Costa. At this same interview petitioner stated again that the above-mentioned municipal bonds had not been purchased for him, but rather that said bonds had been purchased by someone else and had been transferred to petitioner in satisfaction of a debt; whereas in point of fact, he had purchased said bonds with his own money, while he was using the name of Ralph Costa. Also at this interview, petitioner stated that he had not been to the West Coast *280 of the United States in 1955; while in point of fact he, using the name of Ralph Costa, had personally made purchases of electrical supplies in California in 1955; and also had dealt personally in California with a representative of a freight forwarding company there, regarding shipment of electrical equipment to Casablanca. On February 20, 1957, petitioner again untruthfully denied to a special agent of respondent that he had ever used the name Ralph Costa. And finally in an interview on March 3, 1959, with an attorney representing the regional counsel of the Internal Revenue Service in New York, petitioner (after admitting making a profit of between $22,000 and $25,000 in the year 1955 as a result of certain export transactions involving the shipment of electrical equipment to Casablanca) stated: "If I am prosecuted, I will lie about anything which I know the Government is unable to prove without my help." On December 16, 1963, petitioner was found guilty by a jury in the United States District Court for the District of New Jersey, of possessing stolen merchandise and transporting stolen merchandise (not here involved) across state lines. This conviction of petitioner was affirmed *281 by the United States Court of Appeals for the Third Circuit on December 17, 1964, in an opinion reported at . An indictment against petitioner, charging him with willful attempt to defeat and evade income tax for the year 1955, was returned on July 20, 1959, in the United States District Court for the Eastern District of New York. Said indictment related to the same transactions which are in issue in the instant case. Petitioner was brought to trial on said indictment on January 12, 1962; and on January 27, 1962, the jury reported that they were unable to agree on a verdict. Subsequently on February 21, 1962, a superseding indictment in the same court and on the same matters was returned against the petitioner, which resulted in a second trial that commenced on May 25, 1962. Thereafter, on June 5, 1962, the jury returned a verdict of "Not Guilty" in petitioner's favor. Petitioner's above-mentioned income tax return for the period July 20-December 31, 1955, was timely filed with the district director at Brooklyn. On said return, the only income reported was interest in the amount of $412.50 on three savings accounts which petitioner had opened in July 1955 at a Brooklyn *282 savings bank. On said return, petitioner showed no tax to be due. Respondent, in his statutory notice of deficiency herein, which was issued on October 23, 1962, determined that petitioner had received unreported income "from export business on electrical equipment in the amount of $134,609.72." Thereafter in the answer which he filed in the instant case, he reduced the amount of such unreported income to $125,381.14. Also in said notice of deficiency, respondent determined that petitioner was liable for additions to tax for fraud and for failure to pay estimated tax. The above revised amount of allegedly unreported income was computed by respondent in his answer herein, as follows: Proceeds from letters of credit: Mondial Investment Corporation
$ 21,116.00
Mondial Investment Corporation
12,800.00
Victor Trading Co.
41,796.00
SAMA
21,174.88
SAMA
31,260.00
Total
$139,146.88
Less: "Downpayments" made to
SAMA
9,228.58
Balance - net sales
$129,918.30
Less: Cost of Sales: Purchases
$3,503.62
Freight
670.11
4,173.73
Gross profit
$125,744.57
Less: Other expense
363.43
Net Profit
$125,381.14
We here find the following additional ultimate facts, respecting the SAMA transactions. The transactions involving SAMA were not *283 part of petitioner's above-described plan or device to enable him to get his own money out of Morocco and into the United States. These SAMA transactions were, rather, parts of a separate scheme to defraud SAMA by inducing that company to have large amounts of money paid to petitioner under letters of credit, as consideration for merchandise of considerable value which was to be imported from the United States into Morocco; and then shipping to SAMA, merchandise of relatively insignificant value. Petitioner realized net profits of $39,493.41 in 1955 from the SAMA transactions, computed as follows: Proceeds from letters of credit
opened by SAMA
$52,434.88
Less: "Downpayments" made to
SAMA
9,228.58
Balance
$43,206.30
Less: Cost of goods sold: Purchases of electri-
cal equipment
$1,779.80
Shipping costs
145.28
1,925.08
Gross profit
$41,281.22
Less: Expenses allocable to
SAMA transactions: Telephone, rent, an-
swering services
$ 121.14
Payment to Costa
1,666.67
1,787.81
Net profit on the SAMA transactions
$39,493.41
Except for the 15 percent downpayments above mentioned, no funds of petitioner were used or expended in connection with the SAMA transactions; and none of his above net profits from these transactions *284 represented a transfer or recovery of his own funds. No portion of the foregoing amount of net profit was reported by petitioner for Federal income tax purposes for 1955, or for any other year. There is an underpayment in petitioner's income tax for the calendar year 1955; and said underpayment is due to fraud within the meaning of section 6653(b) of the 1954 Code. Opinion 1. The first issue in the instant case requires that we determine whether petitioner actually realized profits from what were, in form at least, export sales transactions in which he engaged in February and March 1955, with three Moroccan companies - Mondial Investment Corporation, Victor Trading Company, and SAMA. The position of the respondent is, that in all of these transactions petitioner was selling electrical equipment to these Moroccan firms; and that by shipping equipment of relatively insignificant value and cost instead of equipment of the substantial value which he had contracted to sell and for which he received payment under the letters of credit which said firms had opened, petitioner realized unreported profits in excess of $125,000. The petitioner's position, on the other hand, is that although these *285 transactions were in form export sales of merchandise, they were in substance and reality not sales at all. Rather, petitioner maintains that they were merely parts of a scheme of his to circumvent Moroccan foreign exchange restrictions and thereby enable him to get his accumulated wealth out of Morocco and into the United States. Our findings of ultimate fact on this dispute which involves essentially questions of fact, reflect our convictions with respect to the same. After considering and weighing all the evidence and also after seeing and hearing all the witnesses testify, we are convinced that insofar as petitioner's dealings with Mondial and Victor Trading are concerned, he did realize no profits from the transactions with these two firms; but that as regards the SAMA transactions on the other hand, he did realize profits which are subject to Federal income taxes for the year 1955. Taking up first the Mondial and Vitor Ctrading transactions, the following are some of the reasons that have persuaded us to accept petitioner's position as to these matters. Petitioner had been engaged in business in Morocco for approximately 6 years as an indent agent. In this business he had working *286 arrangements with several prominent American business concerns, under which (if Moroccan firms desired to import the American firms' products) petitioner had the right to handle the importations of the American products into Morocco. From his said business of indent agent, petitioner derived two classes of income: Commissions from his Moroccan customers based on the amounts of the purchases which petitioner handled for them; and also a profit of about 10 francs per dollar on his conversion of the customers' Moroccan francs into the dollars with which the American firms were paid. During this 6-year period, petitioner was enabled to retain more of his earnings than would a United States citizen engaged in business in the United States, by reason of the fact that petitioner was a resident of a foreign country during said period, and therefore was not required to pay, and did not pay, United States income taxes on his earnings and profits derived in Morocco. Thus, in the light of these circumstances, we do not find uncredible the testimony of petitioner that he possessed, at the end of 1954, a sizable accumulation of Moroccan francs which he wished to transfer to the United States. Indications *287 that the Mondial and Victor Trading firms actually were, as petitioner contends, participants in petitioner's scheme to get his accumulated wealth out of Morocco and into the United States by means of fictitious import transactions, are that, despite the fact that these firms received only equipment of insignificant value in comparison to the equipment that they were ostensibly paying for, they (unlike SAMA) never claimed to have been defrauded. The absence of any such claim by either Mondial or Victor Trading indicates, in our view, that they had not paid out anything of their own, but rather that they had been put in funds by petitioner with which to "buy" the dollars that petitioner thereafter received under the letters of credit. Hence, we have concluded as a fact (not without some hesitation and doubt), that when petitioner received dollars from the French American Bank under the letters of credit opened for his benefit in the name of Ralph Costa, he actually did not realize profits from export transactions; but rather, he merely recovered his own money that he had put into the scheme. Such recovery of his own money did not produce taxable income. Accordingly, we hold for petitioner *288 on this point regarding the Mondial and Victor Trading transactions. We turn next to the SAMA transactions. The distinction between these SAMA transactions and those previously discussed, is that petitioner did not, except for certain relatively small downpayments, furnish money to SAMA which thereafter was received by petitioner through the letters of credit, as a mere recovery of his own funds. We have an unimpeached statement by an individual (Kis) who occupied a responsible position with SAMA in early 1955, that SAMA was not, except for said downpayment, reimbursed for the francs that it used to "buy" the dollars that petitioner received under the SAMA letters of credit. SAMA, through its assignee, thereafter brought suit against petitioner, Lo Pinto and Costa, to recover its out-of-pocket loss. Petitioner's position is not helped by the fact that this suit was subsequently settled so far as petitioner and Lo Pinto are concerned, for a fraction of the claim. For the evidence shows that SAMA is still trying to achieve a recovery of its out-of-pocket loss, through another suit against the Chase Manhattan Bank, and also that SAMA's action against Costa has not been dismissed. Moreover, *289 an impelling reason for SAMA's settlement with petitioner was SAMA's belief that petitioner was unable to pay any judgment that might be recovered against him. All these circumstances militate against petitioner's assertion that SAMA did not have a bona fide claim against petitioner for defrauding it. A further indication that SAMA intended to enter into a genuine importing transaction - and not merely to function as a participant in a device of petitioner to transfer his money out of Morocco - is that SAMA, at its own expense, insured each shipment for a value approximating the full price it paid for the merchandise. This would not have been necessary if the only goods which SAMA expected to receive were the items of relatively insignificant value which petitioner shipped to it. We are unable to give any credence to petitioner's testimony (to the effect that he gave Noirot sufficient money to pay over to SAMA in full reimbursement of its outlays), by reason of his unreliability and his propensity not to tell the truth, as amply shown in our Findings of Fact. We have, in our findings of ultimate fact, computed petitioner's profits on the SAMA transactions - in the amount of $39,493.41. *290 It is possible that petitioner's associates (Noirot, Lo Pinto, Costa, and Cohen) shared in such profits; but if they did, it was petitioner's burden to establish this, and he has failed to carry that burden. We hold that petitioner is chargeable with receipt in 1955 of profits from the SAMA transactions in the amount of $39,493.41, which he thereafter held under a claim of right. 2. The second issue revolves around respondent's determination that petitioner is liable for a self-employment tax for 1955. The only defense which petitioner advanced with respect to this issue was the following statement in his brief: "As there was no taxable income there is no self-employment tax due herein." That defense is without merit, since we have held that he did realize taxable income from the SAMA transactions. We decide this issue for the respondent. 3. The third issue relates to whether petitioner is liable for an addition to tax for fraud under section 6653(b). That section states that if any part of any underpayment of tax is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. Here, petitioner did not report for income taxation, or pay any tax, *291 with respect to the profits which we have held that he realized from the SAMA transactions; and consequently there is an underpayment of his income tax for 1955. The burden of proof on this fraud issue is on the respondent; and in our opinion he carried that burden. Persuasive of petitioner's fraudulent intent is the fact that he did (as we have above held) realize substantial unreported taxable income from the SAMA transactions; and that, since he had put no money of his own into these transactions except the 15 percent "downpayment," he must have known that his profits from these transactions were reportable by him for income tax purposes. Moreover, he kept no books and records with respect to these income-generating transactions; and it therefore was necessary for the respondent's investigating agents to engage in extensive investigations, in order to reconstruct petitioner's true income. In addition, petitioner's action in filing a return only for a period commencing after he had concluded the SAMA transactions, was a step calculated to mislead the respondent's agents into not attempting to look for any taxable transactions prior to said date. And finally, petitioner's evasive *292 and untruthful tactics during his several conferences with respondent's agents, respecting the transactions which he had conducted under the assumed name of Ralph Costa, are persuasive of his intent to defraud. After considering and weighing all the evidence bearing upon this fraud issue, we have found as an ultimate fact and here hold, that the underpayment in petitioner's tax for 1955 is due to fraud within the meaning of section 6653(b). Accordingly, the respondent was justified in imposing an addition to tax under said section. The fact that petitioner was acquitted in a criminal tax evasion case involving the year 1955, in no way affects his liability for fraud in the present case. Said acquittal is not res judicata of the issues herein, and the present proceeding does not subject petitioner to "double jeopardy" within the meaning of the ; ; and , affd. (C.A. 4) . 4. The next issue is whether petitioner is liable for an addition to tax for 1955 under section 6654(a) - by reason of his failure to pay any estimated tax for said year. Petitioner's *293 sole defense to this issue is that he realized no income for said year upon which any estimated tax can be predicated. This defense, for the reasons above stated, is without merit. Thus, we decide this issue for the respondent. 5. The final issue concerns the statute of limitations - whether assessment and collection of the deficiency and additions to tax herein, are barred. The respondent relies upon two alternative positions. First he contends that the short-period return which petitioner filed does not qualify as a return for the taxable year - with the result that this is a * "no return" case, as to which, under section 6501(c)(3), assessment and collection may be made at any time. In the alternative he contends that, even if said short-period return is to be treated as a valid return, the same is false or fraudulent with intent to evade tax - so that under section 6501(c)(1), there is no limitation on the period for assessment and collection. We agree with the latter position ** of respondent. Assuming for present purposes (without *294 deciding) that petitioner's shortperiod return may be treated as a valid return, we are convinced that for the reasons mentioned in the third issue above (dealing with the addition to tax for fraud), said return was false or fraudulent with intent to evade tax; and accordingly, that assessment and collection of the deficiency and additions to tax herein, are not barred by limitation. Decision will be entered under Rule 50. Footnotes
*. By official order of the Tax Court, dated 2/3/66 and signed by Judge Pierce, this amount was substituted for the figure $48,718.38.↩
1. The character of a pro forma invoice was described by the petitioner as follows: A pro-forma invoice is in effect an offer to sell. When a person over there [i.e., in Morocco] wants to buy material or merchandise from somebody here [i.e., in the United States] usually, the supplier will tell that buyer in the other country what type of merchandise he is going to ship him, and he makes it up [i.e., a pro forma invoice] as if he has already sold it to him. It is an invoice which resembles an ordinary commercial invoice. It shows to whom it is being sold, the quantities, an itemized list of what is being involved, the unit price, the total price, and in many cases it will also include approximate freight and handling charges. Now, just before the word invoice that you would have in an ordinary commercial invoice, they put in the word pro-forma * * *. This simply means that this is a prior formal invoice. It is prior to the formal invoice, is what it amounts to.↩
*. The words "return for the taxable year - with the result that this is a" were added by official Tax Court order dated 2/24/66 and signed by Judge Pierce.↩
**. The words "the latter position" were substituted for the words "these positions" by official order of the Tax Court dated 2/24/66 and signed by Judge Pierce.↩